1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8               NORTHERN DISTRICT OF CALIFORNIA

9

10   JOHN BOWLES,                         Case No. 19-cv-01027-NC

11              Plaintiff,
                                          **ORDER GRANTING IN PART AND**
12        v.                              **DENYING IN PART DEFENDANTS'**
                                          **MOTION FOR SUMMARY**
13   CITY OF SAN JOSE, TODD AH YO,        **JUDGMENT**
     WILLIAM WOLFE, and ERICK             Re: Dkt. No. 45
14   ENDERLE,

15              Defendants.

16        Before the Court is Defendants the City of San Jose and its police officers Todd Ah

17   Yo, William Wolfe, and Erick Enderle's motion for summary judgment on Plaintiff John

18   Bowles's claim for violation of his Fourth Amendment right to be free from excessive

19   force under 42 U.S.C. § 1983.  After an erratic four-mile car pursuit, Bowles stopped his

20   damaged pickup truck in the entrance to a shopping center.  Believing that Bowles might

21   be pointing a weapon—which was actually a caulking gun—officer Wolfe first shot

22   Bowles.  Next, believing that Bowles might begin driving the truck erratically again and

23   thereby endanger the lives of officers and members of the public, all three officers opened

24   fire on Bowles while he sat in the front seat of the vehicle.  Bowles was shot at least

25   fourteen times and is now paralyzed.

26        The Court finds many disputed material facts regarding: whether Officer Wolfe

27   reasonably believed that the caulking gun was a weapon capable of causing death or

28   significant injury; whether the officers could have feasibly warned Bowles before opening

United States District Court
Northern District of California

1   fire; whether the truck was stationary or even able to move; and whether any bystanders

2   were within harm's way.  The Court also FINDS that the officers are not entitled to

3   qualified immunity because the law was clearly established at the time of the incident that

4   they should not use deadly force unless Bowles posed a significant risk of death or serious

5   physical injury to the officers or others, and that they should warn before using deadly

6   force if feasible.

7   　　　The motion for summary judgment is therefore GRANTED IN PART and DENIED

8   IN PART.

9   **I.    Background**

10   　　　**A. Undisputed Facts**

11   　　　　**1.  Pickup Truck Pursuit**

12   　　　On March 17, 2017, operators received multiple calls about plaintiff John Bowles

13   walking naked in a residential cul-de-sac in San Jose and chasing children.  Dkt. No. 45,

14   Att. 4 (Declaration of Keith Neumer), Ex. 8 (Event Chronology log).  San Jose Police

15   Department officers William Solma and William Wolfe responded.  *Id*; Dkt. No. 45, Att. 2

16   (Declaration of Maren Clouse), Ex. 12 at 13:3– 20 (Deposition of William Solma).  Upon

17   arrival, Officer Solma saw a naked Bowles throwing items into a pickup truck.  Solma

18   Depo. at 14:7–11, 15:20–16:3.  After Officer Solma called out to Bowles, Bowles got into

19   the pickup truck, reversed it, and hit a parked car.  Neumer Decl., Ex. 1 (Officer Solma's

20   body camera footage), at 0:15.  Defendant officer Wolfe arrived at the time of the first

21   collision; next, the pickup truck reversed into Officer Solma's patrol car.  Neumer Decl.,

22   Ex. 5 (Officer Wolfe's body camera footage), at 0:20; Dkt. No. 45, Att. 5 (Declaration of

23   William Wolfe), at ¶ 4.  The pickup truck then departed down San Tomas Aquino road.

24   *Id.*

25   　　　Officers Solma, Wolfe, and defendant officers Todd Ah Yo and Erick Enderle

26   pursued the truck.  Solma Depo. at 17:14–18:9; Dkt. No. 45, Att. 1 (Declaration of Todd

27   Ah Yo), at ¶ 4; Wolfe Decl. at ¶ 8; Dkt. No. 45, Att.  3 (Declaration of Erick Enderle), at ¶

28   4.  For around six minutes and four miles, the officers followed the pickup truck through

United States District Court
Northern District of California

city streets.  *Id.*  During the pursuit, the pickup truck hit another vehicle and a fire hydrant.  Wolfe Decl. ¶ 6; Ah Yo Decl. ¶ 7.  The truck swerved into opposing lanes of traffic, causing other drivers and bicyclists to swerve around it.  Enderle Decl. ¶ 5; Wolfe Decl. ¶ 6.  It sped up to 50 miles per hour in a school zone where children and parents had to run out of its path.  Ah Yo Decl. ¶ 8; Enderle Decl. ¶ 6.  The truck was damaged: a tire came off completely and it threw off sparks, but kept driving.  Enderle Decl. ¶ 7.  Officers Wolfe, Ah Yo, and Enderle suspected that Bowles was under the influence of narcotics, possibly methamphetamine.  Wolfe Decl. ¶ 3; Enderle Decl. ¶ 10; Ah Yo Decl. ¶ 11.

The truck turned onto Lawrence Expressway, drove through the dirt median, and stopped in the eastbound lanes.  Neumer Decl., Ex. 2 (Officer Ah Yo's body camera footage, Part 1), at 3:50–4:50.  Officer Ah Yo stopped behind it and got out of his car, at which point the truck accelerated, turned right, and stopped facing the driveway to a shopping center.  Ah Yo Decl. ¶ 12; Neumer Decl., Ex. 3 (Officer Ah Yo's body camera footage, Part 2).  Officer Ah Yo chased the truck on foot with his gun out.  *Id.*

### 2. Shooting

Officers Ah Yo, Wolfe, and Enderle surrounded the truck with guns out.  Ah Yo Decl. ¶ 14; Wolfe Decl. ¶ 10; Enderle Decl. ¶ 12; Neumer Decl. Ex. 1 (Officer Solma's body camera footage), at 7:45.  The truck was stopped but its engine was still running.  *Id.*  Officer Ah Yo was shouting commands.  Enderle Decl. ¶ 12.  Officers Ah Yo, Wolfe, and Enderle saw Bowles moving around in the cab of the truck.  Ah Yo Decl. ¶ 14; Wolfe Decl. ¶ 10; Enderle Decl. ¶ 12.  The truck door then opened and Officers Ah Yo and Wolfe saw Bowles raise his hands with something in them.  Ah Yo Decl. ¶ 15; Wolfe Decl. ¶ 11.  At first, both officers thought that Bowles was holding a gun.  *Id.*  After a few seconds, Officer Ah Yo realized that Bowles was holding a caulking gun.  Ah Yo Decl. ¶ 15; Dkt. No. 46, Ex. 3 (Deposition of Todd Ah Yo), at 12:8–2.  He called out, "No gun, no gun!"  Solma body camera footage at 7:55; Solma Depo. at 30:6–9.  Officer Wolfe thought that he heard Officer Ah Yo say, "Nail gun."  Wolfe Decl. ¶ 11.  Officer Wolfe fired one shot at Bowles.  *Id.*

1    Bowles shut the door of the truck, continued moving around inside it, and the

2    truck's engine remained on.  Neumer Decl., Ex. 4 (Officer Ah Yo's body camera footage,

3    Part 3), at 0:10–1:10.  Officer Wolfe fired three more shots at Bowles.  Neumer Decl., Ex.

4    5 (Officer Wolfe's body camera footage), at 7:50–8:10.  During these shots, Officer Ah Yo

5    said, "Hit him again."  Ah Yo Depo. at 33:7–8.  He said this because he thought that less-

6    than-lethal rounds were being fired.  *Id*. at 45:11–46:13, 48:10–19.  Once he realized that

7    lethal rounds had been fired, Officer Ah Yo said, "No more shooting."  Ah Yo Depo. at

8    59:2–11.

9    Officer Ah Yo heard the truck's engine change pitch.  Ah Yo Decl. ¶ 18.  Officer

10   Enderle saw the truck's tail lights come on and noticed that Bowles's movement inside the

11   truck caused the truck to move.  Enderle Decl. ¶ 13.  Clouse Decl., Ex. 11 (Deposition of

12   Erick Enderle), at 37:4–38:12.  Officer Ah Yo saw Bowles touching the steering wheel.

13   Ah Yo Decl. ¶ 18.  All three officers, believing that Bowles would start driving the truck

14   again, fired over the course of about one minute: Officer Ah Yo fired once, Officer

15   Enderle fired five or six times, and Officer Wolfe fired at least four or five times.  Officer

16   Solma's body camera footage at 8:55–9:05; Dkt. No. 46, Att. 1 (Declaration of Scott A.

17   Defoe) at ¶ 6.  Bowles fell to his side inside the truck following Officer Ah Yo's shot.

18   Officer Ah Yo's body camera footage, Part 3, at 1:20; Ah Yo Depo. at 53:1–2.

19   Several minutes later, more officers arrived and surrounded the truck with patrol

20   vehicles.  Officer Solma's body camera footage at 14:45–15:25.  A team of eight offers

21   with a rifle, other weapons, and a canine pulled Bowles from the truck.  Clouse Decl., Ex.

22   10 (Deposition of Bruce Barthelemy), at 40:19–24.  Officers handcuffed Bowles and

23   paramedics arrived a few minutes later.  Neumer Decl., Ex. 6 (Sergeant Imobersteg's body

24   camera footage).  Bowles survived but is paralyzed.

25   **B. Procedural History**

26   Plaintiff John Bowles filed this case on February 25, 2019, bringing claims for

27   excessive force and denial of medical care under 42 U.S.C. § 1983 against both the

28   individual officer defendants Ah Yo, Wolfe, and Enderle, and the City of San Jose.  Dkt.

No. 1.  Defendants moved for summary judgment on all claims.  Dkt. No. 45.  In his

opposition to the motion for summary judgment, Bowles voluntarily dismissed his claims

for denial of medical care and all claims for the City's *Monell* liability.  Dkt. No. 46 at 4,

n.1.  The only claim remaining in the case is for excessive force under § 1983 against the

individual officer defendants.

All parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. §

636(c).  Dkt. Nos. 9, 11.

## II.    Legal Standard

Summary judgment may be granted only when, drawing all inferences and

resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any

material fact.  Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under

governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Bald assertions that genuine issues of material fact exist are insufficient.  *Galen v. Cnty. of

L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings,

discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  Once the moving party meets its initial burden, the nonmoving

party must go beyond the pleadings, and, by its own affidavits or discovery, set forth

specific facts showing that a genuine issue of fact exists for trial.  Fed. R. Civ. P. 56(c);

*Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v.

Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).  All justifiable inferences, however,

must be drawn in the light most favorable to the nonmoving party.  *Tolan*, 134 S. Ct. at

1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## III.    Discussion: Excessive Force and Qualified Immunity

Plaintiff claims that the individual defendant officers violated his Fourth

Amendment rights under 42 U.S.C. § 1983 by using excessive force.  Defendants move for qualified immunity, arguing that no constitutional violation occurred under clearly established law.

**A. Qualified Immunity Legal Standard**

The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).  The two-pronged qualified immunity analysis queries: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident.  *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001); *Pearson*, 555 U.S. at 232.

At summary judgment, the Court construes the facts in the plaintiff's favor; but the plaintiff bears the burden to show that the law is "clearly established" against the defendants.  *Saucier*, 533 U.S. at 201; *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir 2006).

**1.  Constitutional Violation**

A claim that a law enforcement officer used excessive force to affect a seizure is governed by the Fourth Amendment's "reasonableness" standard.  *Plumhoff v. Rickard*, 134. S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989)); *Tennessee v. Garner*, 471 U.S. 1 (1985).  This standard requires balancing the nature and quality of the intrusion into the individual's Fourth Amendment interests against the government's countervailing interests.  *Graham*, 490 U.S. at 396.  The government interests at stake include the severity of the crime at issue, whether the suspect was actively resisting arrest or attempting to evade by flight, and, most importantly, whether the suspect poses an immediate threat to the safety of officers or others.  *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2009); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).  The question of reasonableness is asked from the perspective "of a reasonable officer on the scene,

United States District Court
Northern District of California

1    rather than with the 20/20 vision of hindsight." *Id.* If an officer has "probable cause to

2    believe that [a suspect] has committed a crime involving the infliction or threatened

3    infliction of serious physical harm, deadly force may be used if necessary to prevent

4    escape, and if, where feasible, some warning has ben given." *Garner*, 471 U.S. at 11–12.

5         Defendants only move for qualified immunity based on the "clearly established"

6    prong of the analysis.  Nonetheless, the Court briefly discusses the constitutional violation

7    prong to begin.  Applying the *Graham* factors to the facts here, the Court finds that the

8    defendants have failed to show an absence of disputed material facts as to whether the

9    officers' behavior was reasonable.  First, the crimes at issue include Bowles running naked

10   in a cul-de-sac and driving erratically and dangerously through city streets.  To be sure, his

11   behavior was disturbing and could have caused public harm.  But not a single person was

12   actually injured by Bowles's driving, and at the time he was shot, Bowles was not

13   apparently committing any further dangerous crimes.  Second, there exist disputed material

14   facts as to whether Bowles was evading arrest.  He certainly fled from the police during

15   the four-mile pursuit prior to the shooting.  But at the time that officers opened fire on

16   Bowles, neither he nor his pickup truck were moving—and it is unclear whether the pickup

17   truck was able to run at all.  Bowles's testimony suggests that he opened the truck door in

18   an attempt to surrender before the first shot was fired.  The pursuit, it seems, had ended.

19   Finally, while Bowles had absolutely endangered the safety of pedestrians as he swerved

20   across lanes and over sidewalks, disputes of fact exist as to whether Bowles was still a

21   danger to anyone at the time he was shot.  It is not clear whether the officers who shot

22   Bowles believed him to be armed with a weapon.  It is similarly unclear whether any

23   pedestrians in the parking lot were at risk of being injured by the pickup truck.

24              **2.  Whether the Right was Clearly Established**

25         Defendants remind the Court that "clearly established law should not be defined at a

26   high level of generality."  Motion at 8 (quoting *White v. Pauly*, 137 S. Ct. 548, 553 (2017)

27   (citations and quotations omitted)).  They argue that "no controlling case held at the time

28   of this incident that officers could not use deadly force against an apparently deranged

suspect who aggressively chased children, rammed a police car, careened through crowded streets, stopped and pointed what appeared to be a gun at officers, and then showed signs he was about to resume his vehicular rampage." Motion at 11. Defendants' detailed, dramatic rendering of the facts indeed presents as an "unprecedented" set of circumstances. *Id.* And Plaintiff provides his own version, admitting that "there are no prior excessive force cases involving the use of deadly force without warning against a naked man experiencing a mental crisis who has no deadly weapon and made no verbal threats and is holding a green caulking tool while occupying a stationary and disabled truck with no person in the truck's potential path." Opp. at 20. But while the combination of facts that make up this case is surely unique, the Court finds that clearly established law existed at the time of the incident that covers each separate use of deadly force when assessed individually.

### i.   Officer Wolfe's First Shot

It was clearly established at the time of the shooting that deadly force may only be used if necessary to prevent a suspect's escape when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. The parties here agree that the force used was deadly: Bowles was shot at least 14 times and left paralyzed. Officer Wolfe fired the first shot at Bowles. Wolfe Decl. ¶ 11. He did so because he saw Bowles raise his hands with something in them as if he was holding a gun. *Id.*

### a.   The Caulking Gun

Defendants offer *Rivera v. Cater* to show that qualified immunity covers Wolfe's first shot. 2019 WL 5102287, at *5 (E.D. Cal. Oct. 11, 2019). There, a suspect who had been behaving strangely and entering homes uninvited ignored officers' commands and instead raised his arms, clasped his hands together, cocked his head, and screamed "Ahh!", at which point officers opened fire on him. *Id.* at *2. The Court there held that the officers were entitled to qualified immunity because they would not have known that the use of deadly force was unreasonable where an unarmed suspect acts in a threatening, aggressive,

8

and erratic manner, causing the officers to fear for their lives. *Id.* at \*3.  The Court agrees that, like in *Rivera*, Bowles was acting erratically on the day he was shot.  But under Bowles's version of the facts, he was not ignoring officers' instructions—rather, Bowles testified that he opened the door of the truck in response to officers' commands that he surrender.  Dkt. No. 46, Att. 7 (Deposition of John Bowles), at 108:13–22 ("*Question*: Do you remember trying to comply with police commands? *Answer*: No. I believe I must have – I had opened the door that day, or the video shows. So, no, I don't remember. *Question*: Do you think you did comply with police commands? *Answer*: Yes. *Question*: What makes you say that? *Answer*: My door was open."); *Id.* at 111:4–7 ("And I remember drawing a peace sign on the windshield, like, I'm not a threat, you know, peace, you know.").  This case is more like *Estate of Lopez v. Gelhaus*, where a child held a replica gun that officers mistook for an AK-47 but the child did not threaten officers with the toy.  149 F. Supp. 3d 1154, 1160 (N.D. Cal. 2016), *aff'd and remanded sub nom. Estate of Lopez by and thorugh Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017).

Furthermore, there are many questions of fact as to whether Officer Wolfe reasonably interpreted the caulking gun to be a firearm.  Officer Wolfe testified in his deposition that the item he saw was "a light color," definitely not black or blue steel.  Wolfe Depo. at 18:10–25.  Officer Wolfe did not yell "gun" to alert his fellow officers that he had seen a weapon.  *Id.* at 45:4–6.  Nor did he yell at Bowles to "drop" the weapon.  *Id.* at 45:10–20.

Office Ah Yo yelled "no gun, no gun!" before Wolfe shot.  Solma body camera footage at 7:55; Solma Depo. at 30:6–9.  Officer Wolfe does not deny that he heard Officer Ah Yo.  Instead, he says that he thought Officer Ah Yo said, "Nail gun." Wolfe Decl. ¶ 11.  Wolfe testified at his deposition that he thought the object in Bowles's hands was a construction nail gun before he fired.  Wolfe Depo. at 60:24–61:6.  Officer Wolfe testified:

> *Question:* You would agree that a nail gun is different from a firearm?
>
> *Answer:* Uh, I – I have seen nail guns, uh, fire nails, so it can be a firearm.

Wolfe Depo. at 60:2–5.  The Court knows of no precedent supporting Officer Wolfe's

1    classification of a nail gun as a firearm.  Regardless, whether a nail gun could have caused

2    death or serious bodily injury to absolutely anyone in the vicinity of the pickup truck is a

3    question that defendants may try before a jury.

4         The Court finds that a jury could easily determine that Officer Wolfe was

5    unreasonable in firing his first shot at Bowles based on Officer Wolfe's perception that

6    Bowles was holding an item that was a light color, not black or blue steel, that Wolfe

7    believed to be a nail gun, while Bowles complied with Officers' commands to open the

8    truck door and surrender.

9                                          **b.  Warning**

10        It was clearly established at the time of the incident that even when deadly force is

11   necessary, officers should give "some warning" "where feasible." *Garner*, 471 U.S. at 11–

12   12.  The Ninth Circuit has held that "whenever practicable, a warning must be given before

13   deadly force is employed." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997).

14        None of the officers claim to have given any warning before Officer Wolfe shot

15   Bowles; the video footage of the event confirms that no warning was given.  *See* Wolfe

16   body camera footage at 07:40; Wolfe Depo. at 45:14–23.  Just before Wolfe shot Bowles,

17   another officer can be heard yelling, "Put it down." *Id*.  Only Officer Wolfe, and no other

18   officer surrounding the truck, determined that it was necessary to shoot at the precise

19   moment that Wolfe did.  These circumstances suggest that it could have been possible for

20   Wolfe to shout a warning before the time he shot (i.e., when the other officer was yelling

21   "put it down"), or to have shot a few seconds later so as to shout a warning first.

22   Defendants make no argument in their brief or reply as to whether Wolfe could or should

23   have warned Bowles before firing his first shot.

24        The Court finds that whether giving a warning before Officer Wolfe's first shot was

25   feasible is a question for the jury to decide.  It was clearly established at the time of the

26   shooting that deadly force is only reasonable when the suspect poses significant threat of

27   death or serious physical injury to the officer or others. A jury could find that Officer

28   Wolfe was not reasonable in shooting at what he believed to be a nail gun.  It was also

United States District Court
Northern District of California

clearly established at the time of the shooting that an officer should give a warning before using deadly force when feasible.  A jury could find that Officer Wolfe could have warned Bowles before shooting him.  Officer Wolfe is therefore not entitled to qualified immunity as to his first shot at Bowles.

### ii.    The Officers' Second Round of Shots

After Officer Wolfe shot Bowles the first time, Bowles shut the door of the truck and remained inside.  Ah Yo body camera footage, Part 3, at 0:10–1:10.  Officer Ah Yo shouted, "He's gonna go again, he's gonna go again!"  Wolfe body camera footage at 7:50.  Officer Wolfe fired three more shots as Officer Ah Yo said, "Hit him again."  *Id.* at 7:40– 8:10.  In his deposition, Officer Ah Yo testified that when he saw Officer Wolfe's first round go through the window of the truck, "in [his] head [he] thought that was a – a, uh, less than lethal projectile going through the window . . . because, uh, I think because the window didn't shatter . . . I just recall thinking in my head, was that less than lethal?"  Ah Yo Depo. at 45:18–46:12.  It seems that this misunderstanding is what led Officer Ah Yo to say, "Hit him again."  *Id.*  After seeing Officer Wolfe's additional shots go through the door of the truck, Officer Ah Yo realized that lethal shots had been fired.  *Id.* at 47:6–10, 49:8–13.  He asked Office Wolfe if shots had been fired; Officer Wolfe said yes, so Officer Ah Yo reported "shots fired" on his radio.  *Id.* at 48:10–19, 19:2–5.  Officer Ah Yo said, "No more shooting."  Ah Yo Depo. at 59:2–11.

Officer Wolfe testified that he fired these three shots because he thought the vehicle was going to move forward.  Wolfe Depo. at 56:6–10.  Aside from Officer Ah Yo shouting "he's gonna go again!", there are no facts in the record that show why Officer Wolfe believed the truck was about to move again.

But thirty seconds later, the truck's engine changed pitch, its tail lights came on, Bowles's movement inside the truck made it move, and Bowles touched the steering wheel.  Enderle Decl. ¶ 13; Ah Yo Decl. ¶ 18; Enderle Depo. at 37:4–38:12.  Believing that the Bowles was about to start driving again, Officers Wolfe, Ah Yo, and Enderle all shot for a total of at least ten more shots.

United States District Court
Northern District of California

### a.  Pursuit

Defendants rely on cases about high-speed car chases to argue that it was not clearly established at the time of the incident that officers should not have shot Bowles as he sat in the pickup truck.  In *Scott v. Harris*, the Supreme Court held that officers were reasonable in ramming a vehicle off the road to end a dangerous high-speed car chase that threatened the lives of innocent bystanders.  550 U.S. 372, 386 (2007).  In *Plumhoff v. Rickard*, the Court similarly held that officers were reasonable in shooting a suspect who sped dangerously away from a traffic stop for several miles, then spun out and became stuck between police cars, but continued spinning his tires in an attempt to resume his flight.  572 U.S. 765, 777 (2014).  Defendants cite *Mullenix v. Luna* for the proposition that dangerous car chases present an especially strong case for qualified immunity because the Ninth Circuit has been repeatedly reversed by the Supreme Court when it denied qualified immunity to officers who used deadly force to stop a dangerous high-speed car chase.  136 S. Ct. 305, 310 (2015).

Here, whether a dangerous car chase was actually underway at the time the officers shot Bowles is a question that a jury must decide.  Under Plaintiff's view of the facts, the pursuit was over: the pickup truck was stationary for about a full minute before the second round of shots began and it did not move backward or forward at all in the next full minute during which the shots were fired.  Wolfe body camera footage at 7:40–9:55.  Whether the truck moved is in dispute.  The officers' testimony is not entirely consistent on this question.  Officer Nguyen testified that the truck did not move prior to or during the shooting.  Nguyen Depo at 22:7–10.  Officer Ah Yo testified that there may have been very slight forward movement.  Ah Yo Depo. at 11:19–7 ("There is always a little bit of movement, whether that car is moving or not, it was – yeah, I'm sure there was movement however so slight . . . I remember seeing the truck move. I can't tell you how far it moved . . . I think it was forward.").  Officer Enderle testified that he was watching the truck's tires, and "it did not look like the tires themselves were moving," but that he "saw movement of the vehicle," which he believed "was going to come backwards" because the tail lights

changed color.  Enderle Depo. at 36:15–37:19.  Officer Wolfe testified that the truck was stopped when he fired his first shot, but moved forward a couple feet before his second. Wolfe Depo. at 53:22–4.  Officer Rodriguez testified that he "heard the engine rev," but that the truck "didn't move" forward or backward.  Rodriguez Depo. at 41:8–22.

Additionally, the officers had information that suggested that the pickup truck might not be able to move at all.  It was stuck on a curb, smoking, with extensive body damage, and it was completely missing its front right tire.  Rodriguez Depo. at 21:2–18; Wolfe Depo. at 30:2–6.  Bowles testified that the truck was "hurting," "struggling to move," and that before it stopped at the shopping center, if he "pushed on the gas, it wouldn't go." Bowles Depo. at 107:25–108:5.

These facts distinguish this case from *Harris* and *Plumhoff*, where high-speed car chases were underway when officers used deadly force and there was no question whether the vehicles were working.  Here, a jury could conclude that the pursuit had ended and that the officers were not reasonable in their belief that Bowles would once again begin driving the pickup truck.

### b.  Danger to Bystanders

It was clearly established at the time of the incident that officers are not entitled to qualified immunity for shooting at a person attempting to flee in a vehicle that does not pose a danger to them or to the public.  *Acosta v. City and County of San Francisco*, 83 F.3d 1142, 1146 (9th Cir. 1996).

Defendants cite *Brosseau v. Haugen*, where the Supreme Court granted qualified immunity to an officer who shot a suspect just as he started his vehicle in order to protect other officers on foot and other citizens who she believed were in the immediate area.  543 U.S. 194, 196–97.  They emphasize the danger that Bowles posed to innocent bystanders in the parking lot of the shopping center.  Motion at 10.  However, the material fact of whether bystanders were indeed present to be endangered is in dispute.  No bystanders are visible in any officer's body camera footage, which cover different angles of the area. Officers Byrd and Wolfe testified that no one was within twenty feet of the pickup truck.

1     Byrd Depo. at 32:24; Wolfe Depo. at 52:21–24.  Officer Enderle described "citizens all

2     around the area," but similarly testified that no one was within twenty to thirty feet of the

3     vehicle and stated that no officer warned any citizens nearby to get out of the way.

4     Enderle Depo. at 52:21–53:14.

5          The exact movement and position of the truck, officers, and bystanders is important.

6     *See Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020) (holding that "an officer

7     lacks an objectively reasonable basis for believing that his own safety is at risk when firing

8     into the side or rear of a vehicle moving away from him); *see also Acosta*, 83 F.3d at 1147

9     (holding that deadly force violated the Fourth Amendment where an officer was standing

10    in front of the suspect's car, which was rolling very slowly from a standstill such that the

11    officer could have just stepped to the side to get out of its way); *see also Stoddard-Nunez*

12    *v. City of Hayward*, 2020 WL 3074128 at *2–3 (9th Cir. June 10, 2020) (reversing the

13    district court's grant of qualified immunity where an officer shot a driver whose car was

14    moving away from him when there was very little other traffic on the road because the

15    driver posed "no threat to officer safety and, at best, a minimal threat to the public.").

16         Here, a jury must decide whether the officers' belief that the truck posed a threat to

17    them or to bystanders was reasonable.

18                                    **c.   Warning**

19         As discussed previously regarding Officer Wolfe's failure to warn Bowles before

20    firing his first shot, the other officers too were on notice that clearly established law

21    requires a warning before use of deadly force when feasible.  Again, no warning was given

22    before any of the later shots were fired.  A jury could find that officers had ample

23    opportunity to warn Bowles before shooting, particularly given that officers shouted

24    various commands at Bowles as he sat in the truck during the full minute that passed

25    before their second volley of shots.

26         Because material facts are in dispute as to whether the pursuit had ended, whether

27    bystanders were in danger, and whether officers could feasibly have given a warning

28    before shooting Bowles, the Court finds that the officers are not entitled to qualified

United States District Court
Northern District of California

immunity as to their second round of shots at Bowles.

## IV.    Conclusion

As addressed in Part 1, Section B, the plaintiff voluntarily dismisses his claims for *Monell* liability and for failure to provide medical care.  These claims are hereby DISMISSED and defendant the City of San Jose is hereby DISMISSED from the case.

The Court FINDS that a reasonable jury could conclude that the individual officer defendants were not reasonable in their use of deadly force.  A jury must decide disputed material facts to determine whether the officers violated Bowles's Fourth Amendment right to be free of excessive use of force.  The officers are not entitled to qualified immunity because at the time of the shooting, the law was clearly established as to the prohibition on use of deadly force unless the suspect poses a significant threat of death or serious physical injury to the officers or others, and the requirement to warn before using deadly force when feasible.

The motion for summary judgment is hereby DENIED as to the excessive force claim and qualified immunity.


**IT IS SO ORDERED.**


Dated:  June 16, 2020                           _____

NATHANAEL M. COUSINS
United States Magistrate Judge